AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>PAULO BEREJUK, a/k/a Paolo, a/k/a Pablo,<br><br>*Defendant(s)* | )<br>)<br>)  Case No. 14-3252-Otazo-Reyes<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __2007 through August 6, 2013__ in the county of __MIAMI-DADE__ in the __SOUTHERN__ District of __FLORIDA__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 846 | Conspiracy to distribute testosterone, a Schedule III controlled substance, in violation of Title 21, United States Code, Section 846. |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Gene G. Grafenstein, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/17/14

_____
*Judge's signature*

City and state:  Miami, Florida        Alicia M. Otazo-Reyes, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Gene Grafenstein (the "Affiant"), being duly sworn, do hereby depose and state the following:

1. I am a Special Agent with the Drug Enforcement Administration (hereinafter "DEA") assigned to the Miami Field Division Tactical Diversion Squad (hereinafter "TDS). As such, I am an investigative or law enforcement Officer of the United States within the meaning of Title 18, United States Code, Section 2510 (7), that is, an Officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516 (1).

2. I have been employed by the DEA as a Special Agent since July 2009. I have attended the Drug Enforcement Administration Training Academy for which the curriculum lasted nineteen weeks. This curriculum included training in federal law, physical surveillance, undercover negotiations, and electronic surveillance. Prior to DEA, I was an Officer/Inspector with United States Customs and Border Protection ("hereinafter "CBP"), formerly the United States Customs Service, for eight and a half years. My duties with CBP included interviews and inspections of passengers and conveyances, targeting of suspected drug traffickers and terrorist suspects, as well as making arrests of violators.

3. By virtue of the position as a Special Agent, your Affiant is a federal law enforcement officer empowered to conduct investigations into the unlawful possession, possession with the intent to distribute, and unlawful distribution of controlled substances, and their associated conspiracies and make arrests for violations of Title 21, United States Code, Sections 841 and 846. Your Affiant has received specialized training relating to the investigation of drug

trafficking and money laundering. I have also participated in numerous criminal investigations as part of my duties as a federal law enforcement officer.

4. This affidavit is being submitted to support the issuance of a criminal complaint against Paulo BEREJUK. Your affiant submits that there is probable cause to believe that Paulo BEREJUK engaged in a conspiracy to distribute a Schedule III controlled substance, namely testosterone, in violation of Title 21 United States Code, Section 846.

5. Because this affidavit is provided for the limited purpose of establishing probable cause to support an arrest, I have not included all facts pertaining to this investigation, but rather set forth only those facts that I believe are necessary to establish probable cause. The information in this affidavit is based upon my personal knowledge as well as information I have obtained from other law enforcement agents and officers or other individuals who have personal knowledge of the facts herein.

## **PROBABLE CAUSE**

6. Based on an investigation by DEA's Tactical Diversion Squad, agents learned that from sometime in 2007 to August 6, 2013, in Miami, Florida, and elsewhere, BEREJUK, a black market source of supply of testosterone, distributed testosterone to three confidential sources (hereinafter "CS1," "CS2," and "CS3"). CS1, CS2, and CS3 have been fully debriefed by DEA special agents about their sources of supply of illicit Scheduled III controlled substances. In addition, the CSs have testified before a federal grand jury and explained how they conspired with others to distribute Scheduled III controlled substances. All three CSs have pled guilty to conspiracy to distribute testosterone, in violation of Title 21, United States Code, Section 846. The CSs are pending sentencing hope to receive a reduced sentence for their cooperation.

7. CS1 advised agents that BEREJUK was CS1's first source of supply of Schedule III controlled substances. CS1 advised that he/she was partners with a doctor named Carlos Nazier in Miami-Dade County, operating a so-called anti-aging clinic. Nazier, however, had lost his doctors license after having been convicted for a federal felony offense as Nazier was illicitly distributing testosterone out of his clinic. Nazier introduced CS1 to his source for testosterone, and other Scheduled III controlled substances, which was BEREJUK, sometime in 2007. CS1 started frequenting BEREJUK's home in southwest Miami-Dade County, where BEREJUK concocted the controlled substances in the residence's garage. According to CS1, BEREJUK had considerable knowledge of chemistry, and was capable of manufacturing controlled substances out of raw materials. CS1 began purchasing testosterone and Human Growth Hormones (hereinafter "HGH") from BEREJUK in 2007, until 2011; CS1 was paying BEREJUK up to $20,000, approximately, every month.

8. CS1 ended the relationship with BEREJUK sometime in 2011, when BEREJUK sold a portion of his business to BEREJUK's co-conspirator, Jorge Velazquez (hereinafter "Velazquez"). At this point, CS1 began obtaining controlled substances for CS1's anti-aging clinic from Velazquez, who had already been involved with CS1 in supplying testosterone to major league baseball players. Jorge Velazquez has pled guilty recently to a federal charge of conspiracy to distribute testosterone, case number 14-20550-Cr-Altonaga.

9. CS2 advised DEA agents about his participation with CS1, Velazquez, and BEREJUK in the distribution of testosterone and HGH. According to CS2, he/she began working for CS1 at one of CS1's clinics in Miami-Dade County in approximately December 2009. CS2 delivered testosterone to the homes of CS1's clients. On at least one occasion CS1 sent CS2 to BEREJUK's Kendall-area home to pick up testosterone. CS1 told CS2 BEREJUK was one of

CS1's sources of supply. CS2 advised that he/she was introduced to BEREJUK as the person who provided "all the meds" (medication). CS2 picked up a two day supply of testosterone from BEREJUK; the testosterone was contained in glass vials that had written on them a brand name, the quantity in milliliters, and the name of a company, but not the name of an actual patient. It was CS2's understanding that BEREJUK manufactured the testosterone himself. CS1 later told CS2 in March 2011 that Velazquez had taken over BEREJUK's business, and would now be their source of supply for testosterone.

10. On the occasion that CS2 went to BEREJUK's home, BEREJUK told CS2 that he was a chemist and had a lab for making "meds." CS2 saw "meds" in BEREJUK's refrigerator. BEREJUK also told CS2 that he had a warehouse where he kept his machinery for making "meds." BEREJUK offered his business for sale to CS2, saying that he had been in this business for years and was tired of it.

11. CS2 advised that CS2 and CS1 ordered their medication, specifically testosterone and HGH, from BEREJUK via telephone calls and/or text messages. An examination of the text messages from CS2's cellular telephone revealed hundreds of text message orders ranging from October 26, 2011 to March 4, 2013. Below are a few of the text message orders that CS2 placed with BEREJUK when CS2 was working with CS1's clinic, and when CS2 was distributing Schedule III controlled substances on his own.

12. The following is a text message order of testosterone and HGH that CS2 sent on November 8, 2011, to BEREJUK:

> "Anavar/proviron/ turinobol 5 of each, winnie 4 of the 20 mg, triple stack 10, deca 3, masterone primo trenbolone eqouipoise boldenon 2 of each, test 400 enanthate 3, hgh kits 16, igf1-lepton 5, cypinate sustanon suspension 4 of each, propinate enanthate 6of each pt141 6 viles, cjc 15

4

viles, ghrp2 & 6 7 viles each, mic 12. Let me know how much will this be I'll pay cash"

13. On January 11, 2012, CS2 sent a text message order to BEREJUK whereby CS2 was ordering testosterone and HGH from BEREJUK:

"Paolo order: 4 kits of hgh, 2 kits of ghrp, 4 kits of cjc, 5 Winnie 20ml, 10 propinate, 6 cypinate, 10 triple stack, 5 trenbolone, 5 sustanon, 5 deca, 1000 app supp,"

14. CS3 advised agents that he/she made deliveries of controlled substances to customers of Velazquez's business, Boca Body located in Coral Gables, Florida. CS3 told agents that he/she started working for Velazquez in 2012 as a deliveryman. CS3 advised that Velazquez was obtaining testosterone from CS1, who was getting the testosterone from a person named "PAOLO" or "PABLO." CS3 learned that at some point CS1 introduced Velazquez to PAOLO, who then became Velazquez's source of supply for testosterone and other controlled substances. Velazquez would order 10-15 different types or brands of testosterone from PAOLO and would routinely write a check for $1500, up to $3000 in payment to PAOLO. These checks were written on the Boca Body account at International Finance Bank ("IFB"), among others, and signed by Velazquez. The government has subpoenaed that account, and has obtained copies of such checks from Velazquez to BEREJUK.

15. CS3 related to agents that CS3 only picked up testosterone on just one occasion in 2012 from PAOLO. CS3 was able to identify a photo of BEREJUK from a spread of 6 photos, as the person that CS3 obtained testosterone from on that one occasion.

## CONCLUSION

16. Based on the information stated above, the affiant submits that there is probable cause to believe that Paulo BEREJUK engaged in a conspiracy to distribute a Schedule III

5

controlled substance, namely testosterone, in violation of Title 21 United States Code, Section 846.

FURTHER YOUR AFFIANT SAYETH NAUGHT

_____
GENE GRAFENSTEIN, SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn to before me this
17th day of October, 2014

_____
HON. ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE